JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Cashmere Young, appeals from the judgment of the Cuyahoga County Common Pleas Court, rendered after a jury verdict, finding him guilty of aggravated burglary and vandalism and sentencing him to three years incarceration. Appellant contends there was insufficient evidence to sustain his convictions and the verdict was against the manifest weight of the evidence. We disagree and affirm appellant's convictions.
 FACTUAL BACKGROUND {¶ 2} The record reflects that the Cuyahoga County Grand Jury indicted appellant in July 2002 on one count of aggravated burglary, in violation of R.C. 2911.11, and one count of vandalism, in violation of R.C. 2909.05.
 {¶ 3} At trial, Juanita Petty testified that in May 2002, she and her three children lived at 561 East 123rd Street in Cleveland On May 14, 2002, at approximately 10:30 p.m., Juanita saw her sister-in-law Anna fighting in the street outside her home with a woman named Red, who lived two doors down from the Petty family. Shaneequa and Tamika, two of Juanita's children, were also out in the street, along with Red's niece Shannon and Red's sister Markita Baker, who was six months pregnant.
 {¶ 4} According to Juanita, Markita stabbed Shaneequa in the hand with a knife when Shaneequa tried to separate Anna and Red. Juanita called the police, who came and arrested Shaneequa for swinging at Markita with a tire iron during the fight. Before leaving the scene, the police told the members of both families to go into their houses and advised them that if they had to return, all involved parties would go to jail.
 {¶ 5} Juanita testified that after the police left, she, her daughters, her sister Antoinette, her sister-in-law Anna, Anna's cousin Tanya, and a woman named Jammie Collier went into her house. About twenty minutes later, as Juanita was on the telephone discussing Shaneequa's injuries with a police detective, she heard Markita and a group of people outside on her front porch. Juanita hung up the phone, locked the front door of her house and then called 911.
 {¶ 6} According to Juanita, she heard someone in the group outside her door say "wrecking crew" or "wreck shop" and then heard the front windows breaking and what sounded like kicking on the front door. Juanita testified that she tried to hold the front door shut, but after several kicks, it flew open and appellant entered her home.
 {¶ 7} As he came into the house, appellant asked, "Y'all want to die?" and then reached into his pants for what Juanita assumed was a gun. Appellant then threw a television set to the ground, knocked over a glass-top table, picked up another glass-top table and threw it at Antoinette, punched Tanya in the face and walked out of the house.
 {¶ 8} Juanita testified that the police arrived shortly thereafter and she pointed out appellant, who was standing in front of his home, to a detective. Juanita identified State's Exhibits 1-14 as photographs of the damage done to her house by appellant and identified appellant as the individual who threatened her and ransacked her house.
 {¶ 9} On cross-examination, Juanita testified that several males from the neighborhood who usually hung out on her front porch or near to her house were around that evening shortly after Shaneequa was stabbed, but left after the police gave their warning. Juanita admitted that she did not know if these males went to appellant's house sometime after midnight to get revenge for Shaneequa's stabbing.
 {¶ 10} Anna Green testified that she was involved in a fight with Red on the evening of May 14, 2002 and that she saw Markita Baker stab Shaneequa during the fight. Anna testified further that when the police left after arresting Shaneequa and warning everyone to go inside, she went into Juanita's house. According to Anna, a short time later she went out onto the porch to see what was going on in the neighborhood and observed a large group of people running toward the Petty house. She ran inside yelling, "They're coming, they're coming," and then ran to the kitchen to look "for something to use."
 {¶ 11} Anna testified that she heard banging on the windows and front door and then saw appellant come through the front door yelling "wrecking crew" or "wrecking shop." According to Anna, when the women in the house ran at appellant, he pulled up his shirt, showed them what "looked like a gun" and then asked, "What y'all hoes want to do?" Anna testified that when she saw the gun, she ran to a back room, locked the door and then waited as she heard a lot of banging and crashing.
 {¶ 12} Anna also testified that the "neighborhood guys" were walking up and down the street after Shaneequa was stabbed but denied that anyone from the Petty household told the males to go to appellant's house to get revenge.
 {¶ 13} Jammie Collier testified that her boyfriend, Angelo Petty, dropped her and Antoinette off at Juanita's house on May 14, 2002 shortly after Shaneequa was stabbed. Later, Jammie heard glass shattering and banging on the front door. After the door was kicked in, she saw appellant enter the house and then heard him say, "Do y'll bitches want to die?" as he reached for the waistband of his pants. Jammie testified that she saw the "handle part" of a gun in appellant's pants and then saw him knock down a television set and throw a glass-top table on Antoinette. Jammie, Shaunte, Shanay and Tamika ran to a back room, barricaded the door and then crawled out a window. They then ran to a neighbor's house and called 911.
 {¶ 14} Jammie testified that she was "absolutely positive" that appellant was the individual who threatened her. On cross-examination, Jammie testified that she learned appellant's name when she heard a woman who was standing with the crowd of people on the porch outside Juanita's house say, "Cashmere, come on," as appellant was inside the house throwing things.
 {¶ 15} Juanita's daughter Tamika Petty testified that after the door was kicked in, she saw appellant come into the house and then throw a table at Antoinette. Tamika testified that she also heard appellant say, "Do y'all bitches want to die?" and then saw him reach for a "handle" that she thought was either a knife or a gun. When she saw the handle, Tamika ran into a bedroom and then crawled out a window.
 {¶ 16} On cross-examination, Tamika testified that earlier in the evening after Shaneequa had been stabbed, she and several other people were outside arguing with appellant. According to Tamika, appellant told them that "he was going to get some older ones to fight us. And if anyone came off the porch, he was going to hit us."
 {¶ 17} Juanita's sister, Antoinette Petty, testified that after the police warned everyone to go inside, she stood by the front door of Juanita's house with Juanita and Anna. A short time later, she heard people running down the street shouting, "wrecking crew," so she and Juanita slammed the door shut and locked it. Antoinette then heard windows breaking and kicking on the front door. According to Antoinette, when the door came off its hinges, appellant came into the house "asking us do we want to die" and then punched Tanya in the face, "slammed the T.V. over," and threw a coffee table at her.
 {¶ 18} Cleveland police officer Sabrina Walker testified that she responded at approximately 12:15 a.m. on May 15, 2003 to a report of a neighborhood fight at 561 East 123rd Street. Walker testified that she spoke with Juanita Petty, who identified appellant as the perpetrator. Walker observed that the front windows of the Petty home were broken, the door was kicked in, a television set was on the floor and a glass-top table was broken. Walker testified that after arresting appellant, she spoke with appellant's sisters, who told her that their home had also been broken into. Walker testified that she inspected their home but did not observe any damage.
 {¶ 19} Cleveland police detective Lori Terrace testified that she questioned appellant the day after the incident. He told her that when the police left after the incident involving Shaneequa, he went inside his sister's house to watch TV. A short time later, his niece advised him that there was a loud crowd of people on the front porch of the house, banging on the door. Appellant told Terrace that he started to open the door, but quickly shut it because it seemed as if the crowd wanted to force its way into the house. Appellant told Terrace that he then went outside and got into a fight in the front yard with a man he did not know. Appellant then went back into the house and shortly thereafter, the police arrived and arrested him.
 {¶ 20} Four witnesses testified for the defense. Appellant testified that he arrived at his sister Antoniette's house at approximately 9:00 p.m. on May 14, 2002. Antoinette, who is also known as Red, told him that her foot had been injured and she had been maced during her earlier fight with Shaneequa.
 {¶ 21} According to appellant, Antoinette left to get treatment for her foot and he went inside to watch TV. As he was watching TV, Shannon yelled that a large crowd of people was approaching the house. Appellant testified that he looked out the front window and saw approximately 15 individuals, most of them male, in the yard. Appellant testified that when he went outside to see what the individuals wanted, a large black male stepped out of the crowd and began fighting with him. According to appellant, the individuals in the group surrounded him and the male, but he was able to back himself up the front steps of the house as he was fighting. He grabbed the front door and tried to get inside the house, but two males grabbed the door out of his hand Appellant swung again and managed to get inside. According to appellant, one male followed him and got halfway in the door, but appellant fought him off.
 {¶ 22} Appellant testified that he and his girlfriend, Kimberly, were able to shut the door, but the people outside were still banging on the door and yelling, "wrecking crew, we're going to f____ y'all up." When appellant looked out the front window, he saw two males run up to the crowd and start fighting with a few individuals. According to appellant, the crowd then dispersed. Appellant testified that he then ran back outside and saw the male with whom he had been fighting earlier run down the street and into the Petty home. On cross-examination, appellant testified that he had not told Detective Terrace about this man when she questioned him because it "slipped my mind."
 {¶ 23} Appellant's other sister, Markita Baker Young, testified that she was in the bathroom when a crowd began banging on the door and kicking the windows of the house. The crowd broke the storm window out of the door and then one of the males in the group opened the door and tried to get in. Markita testified that after she and appellant pushed him out, she called 911. According to Markita, appellant went out onto the porch and fought with a male who eventually ran down the street to the Petty home.
 {¶ 24} Appellant's girlfriend, Kimberly Smith, testified that in the three years she had known appellant, she had never seen him with a gun or knife. According to Kimberly, she and appellant were watching TV when Shannon advised them that about 15 people were approaching the house. Appellant walked outside and fought with one of the males from the group. When one of the males tried to get in the house, she and appellant pushed him out and shut the door. Eventually, two males came up and started fighting with some of the males in the group and the group dispersed.
 {¶ 25} Appellant's sister Antoinette Young testified that she was not home during the incident but Kimberly called her and told her that there was a large crowd of people outside her house. Antoinette testified that she called 911 and then called two male friends and asked them to go check on her house.
 {¶ 26} On rebuttal, Detective Terrace testified that when she interviewed Kimberly, Markita and Antoinette on the day following the incident, none of them mentioned the two males who allegedly helped disperse the crowd. In addition, Terrace testified that appellant never told her that he saw a male enter the Petty home after the fight.
 {¶ 27} The jury found appellant guilty of both counts and the trial court sentenced him to three years incarceration on the aggravated burglary charge and six months incarceration on the vandalism charge, the sentences to be served concurrently.
 {¶ 28} Timely appealing, appellant has raised two assignments of error for our review.
 SUFFICIENCY OF THE EVIDENCE {¶ 29} In his first assignment of error, appellant contends that the trial court erred in denying his Crim.R. 29 motion for acquittal because the evidence was insufficient to support his convictions.
 {¶ 30} Crim.R. 29(A) provides, in pertinent part:
 {¶ 31} "The court on motion of a defendant * * * shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."
 {¶ 32} A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the State has met its burden of production at trial. State v. Thompkins (1997),78 Ohio St.3d 380, 390. On review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. Id. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 33} Appellant was convicted of aggravated burglary and vandalism. R.C. 2911.11, which defines the offense of aggravated burglary, provides:
 {¶ 34} "No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with the purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
 {¶ 35} "(1) the offender inflicts, or attempts or threatens to inflict physical harm on another; * * *."
 {¶ 36} R.C. 2909.05, regarding vandalism, provides that "[n]o person shall knowingly cause serious physical harm to an occupied structure or any of its contents." Accordingly, to support appellant's conviction for aggravated burglary, the State was required to demonstrate that appellant entered the Petty home by force with the intent to vandalize it and then threatened physical harm to the occupants. To support appellant's conviction for vandalism, the State was required to demonstrate that appellant knowingly caused serious physical harm to the Petty home or its contents.
 {¶ 37} Appellant first contends that the prosecution failed to prove its case "because there was no physical evidence * * *." Appellant ignores the physical evidence presented to the jury, however. The State presented 14 photographs of the damage done to Juanita Perry's home after appellant broke in and vandalized her home. In addition, Joint Exhibit A was a tape recording of the telephone calls made by various parties to 911 on May 14 and 15, 2002, regarding the incidents involving the Young and Petty households.
 {¶ 38} Appellant also contends that the State failed to prove its case because the only evidence against him was the self-serving testimony of the Petty family. If believed, however, the testimony of the Petty family members was sufficient to demonstrate that appellant kicked down the door to the Petty home, entered the home, threatened the women and children who were inside and then ransacked the home.
 {¶ 39} Appellant next argues that there was insufficient evidence to support his convictions because "there is significant speculation as to whether or not there was any physical harm done to the Petty family, and certainly if Mr. Young was ever in the house."
 {¶ 40} Appellant seems to again question the veracity of the Petty family members' testimony. The test regarding the sufficiency of evidence, however, is not whether the evidence is to be believed, but whether, if believed, the evidence would support a conviction. Here, the testimony of the Petty family, if believed, is sufficient to demonstrate that appellant was indeed in the Petty house.
 {¶ 41} Moreover, R.C. 2911.11, regarding aggravated burglary, does not require actual physical harm. It is sufficient that the harm was attempted or threatened. Here, the testimony of the Petty family members, if believed, is sufficient to demonstrate that appellant threatened to kill, or at least hurt, the women and children inside the house. There was testimony from several family members that appellant reached for his waistband, showed the women the handle of a gun or knife and then asked them, "Do y'all bitches want to die?" Appellant's action, coupled with his question, can certainly be construed as a threat to inflict physical harm. In addition, there was testimony from several family members that appellant threw a small table at Antoinette Petty and that he punched Tanya in the face.
 {¶ 42} Likewise, the testimony was sufficient to indicate that appellant vandalized the Petty home and its contents, in violation of R.C. 2905.05. Several Petty family members testified that appellant kicked in the front door of the house and, once inside, threw a television set to the ground, broke a glass-top coffee table and threw another coffee table at Antoinette.
 {¶ 43} Construing the evidence produced at trial in a light most favorable to the prosecution, we conclude that the evidence was sufficient to demonstrate that appellant committed aggravated burglary and vandalism.
 {¶ 44} Appellant's first assignment of error is therefore overruled.
 MANIFEST WEIGHT OF THE EVIDENCE {¶ 45} In his second assignment of error, appellant contends that his convictions were against the manifest weight of the evidence.
 {¶ 46} While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met is burden of persuasion. Thompkins, supra. When a defendant asserts that his conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Otten
(1986), 33 Ohio App.3d 339, 340.
 {¶ 47} Appellant contends that his convictions were against the manifest weight of the evidence because the testimony of the Petty family members was unreliable and contradicted by that of the Young family. Appellant contends that the Petty family members were motivated to lie to seek revenge for Shaneequa's arrest and their testimony was "merely the word of the members of one warring family against the other." Accordingly, he contends, his convictions were against the manifest weight of the evidence.
 {¶ 48} The version of the events of May 15, 2002 given by the defense witnesses, however, is open to suspicion. Although Antoinette testified that she called two male friends to check on her house after Kimberly called her and told her that there was a large group of people outside her home, Detective Terrace testified that Antoinette never mentioned the two men when she interviewed her on the day following the incident. Similarly, although appellant and Kimberly testified that the two men helped disperse the crowd in front of Antoinette's house, neither mentioned the two men to Detective Terrace when they were questioned. Likewise, although appellant and Markita Baker both testified that they saw a male from the crowd run down the street and into the Petty home, neither mentioned the male to Officer Terrace when they were questioned. Finally, although Markita and Kimberly testified that the Young house was damaged when the crowd tried to force its way into the house, Officer Walker testified that she did not observe any damage to the house.
 {¶ 49} Appellant also claims that the testimony of the Petty women was impeached because Juanita admitted that her daughter Tamika was friends with several males from the neighborhood who often hung out on the porch of the Petty home. There is nothing in the record to indicate that this testimony impeached any of the testimony of the Petty women. The witnesses testified that the "neighborhood guys" were around after Shaneequa was arrested but denied that anyone from the Petty household sent the males to the Young house to seek revenge for Shaneequa's arrest. Moreover, any testimony about the males was not relevant to whether appellant was the individual who burglarized and vandalized the Petty home.
 {¶ 50} The jury chose to believe the prosecution witnesses rather than the defense witnesses. We find nothing in the record to indicate that in doing so, the jury lost its way and created such a manifest miscarriage of justice that appellant's convictions must be reversed. Rather, the record reveals substantial evidence from which the jury could have concluded, beyond a reasonable doubt, that appellant was guilty of both aggravated robbery and vandalism of the Petty home.
 {¶ 51} Appellant's second assignment of error is overruled.
 {¶ 52} The judgment is affirmed.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DIANE KARPINSKI, P.J., and JOHN T. PATTON, J.,* concur.
* Judge John T. Patton, retired, of the Eighth District Court of Appeals Sitting by Assignment.